# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )     Case No. 2:09-mj-00146-GWF
                                   )
vs.                                )     **DECISION**
                                   )
REBECCA STOUT,                     )
                                   )
                    Defendant.     )
_____)

The Complaint in this case charges Defendant Rebecca Stout in Count One with operating a motor vehicle while under the influence of alcohol to a degree that rendered her incapable of safe operation in violation of 36 C.F.R. §4.23(a)(1).  Defendant is charged in Count Two with operating a motor vehicle with an alcohol concentration in Defendant's breath of 0.80 grams or more of alcohol per 210 liters of breath in violation of 36 C.F.R. §4.23(a)(2).  She is charged in Count Three with having an open container of alcoholic beverage in her motor vehicle in violation of 36 C.F.R. § 4.14(b), and in Count Four, Defendant is charged with violation of a closure order pursuant to 36 C.F.R. § 1.5(f).

This case came on for trial before the Court on November 18, 2009.  At the conclusion of the trial, the Court found Defendant guilty on Count Three and ordered the parties to file post-trial briefs in regard to the other counts.  The Government filed its Supplemental Closing Brief (#12) on December 2, 2009.  Defendant filed her Supplemental Closing Brief (#13) on December 15, 2009 and the Government file its Supplemental Reply Brief (#14) on December 23, 2009. The Court now renders its decision and verdict on the remaining charges.

. . .

. . .

1

## FACTUAL FINDINGS

2       On the evening of September 29, 2008 National Park Service Ranger Michelle Schonzeit

3   was on duty in the Lake Mead National Recreation Area in the vicinity of Boulder Beach and the

4   Boulder Beach Access Road.  Ranger Schonzeit testified that on that date there was an order in

5   effect which closed the Boulder Beach area to motor vehicles between dusk and 6:00 a.m.[1]  At

6   approximately 8:05 p.m., Ranger Schonzeit observed a Nissan automobile pass through an open

7   gate on the Boulder Beach Access Road which was posted with a sign stating "closed from dusk

8   to dawn."  Although it was dark outside, Ranger Schonzeit  testified  that the access road gate

9   had not yet been closed by the rangers.  Ranger Schonzeit observed the vehicle travel for

10  approximately one mile along Boulder Beach with its right turn signal continuously activated

11  although there was no apparent place for the vehicle to make a turn.  The vehicle also braked and

12  accelerated several times and the operator switched back and forth from high beam to low beam

13  headlights.  The vehicle then stopped near the water's edge.  Ranger Schonzeit testified that these

14  observations made her suspicious that the operator might be impaired.

15      Ranger Schonzeit proceeded to stop her patrol vehicle behind the Nissan and activated

16  her emergency lights.  The ranger approached the vehicle and made contact with the operator,

17  Defendant Rebecca Stout, who was in the driver's seat.  The vehicle's engine was running and

18  the transmission was still in drive.  Ranger Schonzeit told Defendant to place the transmission in

19  park.  The ranger observed that Ms. Stout was holding an open bottle of Coors beer in her right

20  hand.  Ranger Schonzeit testified that she noticed a strong smell of alcoholic beverage on Ms.

21  Stout's breath.  Her eyes appeared to be watery, red and bloodshot.  Ms. Stout also slurred her

22  words and had difficulty with pronunciation.   Ranger Schonzeit asked Ms. Stout for her driver's

23

24      [1]The Government has attached as Exhibit "2" to its Supplemental Brief, a copy of the

25  National Park Service's Superintendent's "Compendium of Designations, Closures, Permit
Requirements and Other Restrictions Imposed Under Discretionary Authority for the Lake Mead

26  National Recreation Area."  The Compendium states in pertinent part that "Boulder Beach is
open to motor vehicles from 6:00 AM to 10:00 PM from Memorial Day weekend through Labor

27  Day weekend, and from 6:00 AM to dusk from Labor Day weekend to Memorial Day weekend.
It is open to pedestrian use 24 hours a day."

28

2

1   license, vehicle registration and proof of insurance card.  Instead of producing her driver's

2   license, Ms. Stout provided a military identification card.  Ms. Stout, however, produced her

3   driver's license upon the second request.  Ranger Schonzeit asked Ms. Stout if she had been

4   drinking and Ms. Stout responded that she "had a few."  Based on the driving behavior she had

5   observed and Ms. Stout's condition, Ranger Schonzeit believed that Ms. Stout was under the

6   influence of alcohol.

7           Ranger Schonzeit requested that Ms. Stout exit the vehicle.  Ms. Stout did so, while still

8   holding the beer bottle in her hand.  The ranger asked Ms. Stout to set the bottle down on the

9   vehicle which Ms. Stout did.  The ranger observed that the bottle was open, a quarter full and

10  was cold to the touch.  Ranger Schonzeit also observed other open, empty beer bottles and

11  several unopened beer bottles in the car.  When Ms. Stout exited the vehicle, she swayed and

12  leaned on the vehicle for support.

13          Ranger Schonzeit thereupon administered the standardized field sobriety tests to Ms.

14  Stout.  This included the Horizontal Gaze Nystagmus ("HGN") test, the Walk and Turn test and

15  the One Leg Stand test.  Ranger Schonzeit testified that in performing the HGN test, she looks

16  for nystagmus, i.e., involuntary jerking of the eyeball as it moves from side to side.  The ranger

17  observed six out of six clues on the HGN test that she performed on Ms. Stout.  Ranger

18  Schonzeit testified that based on her training, which includes the National Highway Traffic

19  Safety Administration's ("NHTSA") study regarding the HGN test, the results indicated that Ms.

20  Stout's blood alcohol content was probably in excess of 0.10.

21          Ranger Schonzeit testified that during the Walk and Turn test Ms. Stout failed to follow

22  the instructions given to her.  She started to walk before she was told to do so, was unable to

23  maintain her balance during the instruction phase of the test, failed to touch heal-to-toe as

24  instructed on several steps, stepped off line, took the incorrect number of steps and completed an

25  improper turn.  Ranger Schonzeit stated that there were six clues out of a possible eight

26  indicating that Ms. Stout failed the Walk and Turn test.  Based on the results of the Walk and

27  Turn test and her training, Ranger Schonzeit also believed that Ms. Stout had a probable blood

28  alcohol level greater than 0.10.  Finally, Ranger Schonzeit testified that Ms. Stout also failed the

CRITICAL

One Leg Stand test in that she raised her arms, swayed and put her foot down while attempting to perform the test. Ms. Stout also ceased performing the test before she was told to stop. Ranger Schonzeit again testified that Ms. Stout's inability to properly perform the One Leg Stand test indicated a probability that her blood alcohol content was in excess of 0.10.

Ranger Schonzeit then administered a preliminary breath test ("PBT") to Ms. Stout by having her blow into a portable instrument that the ranger had in her possession for that purpose. The result of the PBT indicated that Ms. Stout had an alcohol concentration in her breath of .184 grams or more of alcohol per 210 liters of breath. Based on her observations, the field sobriety tests and the PBT test, Ranger Schonzeit concluded that there was probable cause to believe that Ms. Stout had operated her motor vehicle while under the influence of alcohol. The ranger therefore arrested Ms. Stout and transported her to the Lake Mead Ranger Station where she administered the Intoxilyzer 5000 breath test to Ms. Stout.

Ranger Schonzeit testified that she had been trained and certified to administer the Intoxilyzer 5000 breath test, and it appears from her testimony that she administered the test in accordance with the requirements of her training and the required checklist for performing the test.[2] This included observing the Defendant for fifteen minutes before the intoxilyzer test begins to ensure that alcohol that may have been present in the subject's mouth has dissipated and will not give a false alcohol concentration. The two Intoxilyzer 5000 breath results which were obtained from Ms. Stout at 8:41 p.m. and 8:44 p.m. indicated that she had an alcohol concentration in her breath of .178 grams and .182 grams of alcohol per 210 liters of breath,

---

[2]In her post-trial brief, Defendant argues that the tests were performed on an Intoxilyzer 5000EN machine and that the Government failed to establish that Ranger Schonzeit was certified to perform tests using the Intoxilyzer 5000EN as opposed to the Intoxilyzer 5000. Defendant did not object to Ranger Schonzeit's certification or qualification regarding the Intoxilyzer 5000 or Intoxilyzer 5000EN during trial. The Court therefore finds that an objection to Ranger Schonzeit's certification and qualifications based on the type of Intoxilyzer has been waived. In addition, Defendant's post-trial brief does not show that there is, in fact, any material difference between an Intoxilyzer 5000 and an Intoxilyzer 5000EN that would render Ranger Schonzeit unqualified to use the latter equipment, assuming that she is not, in fact, certified on that particular model.

respectively.

Dana Russell, a trained forensic analyst with the Las Vegas Metropolitan Police Department, testified that as part of her duties she inspects, calibrates and maintains the Intoxilyzer 5000 instrument located at the Lake Mead Ranger Station.  Mr. Russell testified that she inspected the Intoxilyzer 5000 instrument on September 8, 2008--three weeks prior to the test performed on Defendant Stout.  Ms. Russell testified that the intoxilyzer instrument was correctly calibrated and properly functioning on September 8, 2008.  She subsequently inspected the Intoxilyzer 5000 instrument on December 8, 2008 and again found that it was calibrated and functioning properly on that date.  Ms. Russell also reviewed the printed Intoxilyzer 5000 test results for the tests performed on Ms. Stout.  She testified that it appears from the printed Intoxilyzer test results that the tests were properly conducted and the results are valid.  Ms. Russell also testified that prior to September 8, 2008 she calibrated the Portable Breath Test device that Ranger Schonzeit used to test Ms. Stout's alcohol concentration before placing her under arrest.

The Court found Ms. Stout guilty on Count Three of the Complaint charging her with having violated 36 C.F.R. § 4.14(b), based on the undisputed evidence that Ms. Stout was holding an open and partially consumed bottle of beer in her vehicle when Ranger Schonzeit made contact with her.

## DISCUSSION

1.   **Whether Defendant is Guilty of Count Four of The Complaint, Charging Her With Violation  of the Closure Order.**

The Court first addresses whether Ranger Schonzeit had a lawful basis for stopping Ms. Stout's vehicle and whether Ms. Stout violated the Boulder Beach motor vehicle closure order as charged in Count Four of the Complaint.  36 C.F.R. § 1.5(a)(1) provides that the superintendent of the park area may establish for all or a portion of a park area, a reasonable schedule of visiting hours, impose public use limits or close all or a portion of a park area to all public use or to a specific use or activity.  The superintendent is required to compile the designations, closures, permit requirements and other restrictions imposed under his or her discretionary authority and

5

this compilation shall be updated annually and made available for public inspection.   36 C.F.R. §

1.7(b).  As set forth in *United States v. Knauer*, 635 F.Supp.2d 203, 206 n. 2 (E.D.N.Y. 2009),

the court may take judicial notice of the superintendent's compendium containing the closure

orders or use restrictions imposed pursuant to 36 C.F.R. § 1.5.

        According to the Compendium attached to the Government's Supplemental Brief as

Exhibit "2" and Ranger Schonzeit's trial testimony, the closure order in effect on September 29,

2008 provided that motor vehicles were permitted in the Boulder Beach area between 6:00 a.m.

and dusk.  "Dusk" is generally defined as the darker part of twilight or dawn.  "Twilight" is

generally defined as the light from the sky between sunset and full night.  *See* Webster's Third

New International Dictionary (2002).  36 C.F.R. § 1.7 provides that the public shall be notified

of such closure orders or use restrictions by one or more of the following methods:  (1) signs

posted at conspicuous locations such as normal points of entry and reasonable intervals along the

boundary of the affected park locale, (2) maps available in the superintendent's office and other

places convenient to the public, (3) publication in a newspaper of general circulation in the

affected area, and (4) other appropriate methods such as electronic media, park brochures, maps

and handouts.

Ranger Schonzeit testified that it was dark at 8:05 p.m. when Ms. Stout drove into the

Boulder Beach area.  She also testified that there was a sign posted on the entry gate at the

Boulder Beach Access Road which stated "closed from dusk to dawn."  This gate was still open,

however, when Ms. Stout entered the area.  The fact that the gate was open would probably

suggest to even a sober motorist that the beach area was open to motor vehicle traffic.  The

evidence did not establish that Ms. Stout saw or reasonably should have seen the sign on the

open gate as she drove into the Boulder Beach area.  Because there is no evidence that Ms. Stout

knew or clearly should have known that the Boulder Beach area was closed prior to being

contacted by Ranger Schonzeit, the Court finds her not guilty on Count Four of the Complaint.

Although Ms. Stout is not guilty of violating the closure order, Ranger Schonzeit

nevertheless had a lawful basis to stop Ms. Stout's vehicle.   As indicated above, the Boulder

Beach area was closed to motor vehicle traffic when Ranger Schonzeit observed Ms. Stout's

automobile enter that area.  The ranger clearly had the authority to stop Ms. Stout's vehicle for purposes of informing her that the area was closed to motor vehicle traffic and to direct her to leave the area.  Ranger Schonzeit also testified that the unusual behavior of the vehicle operator caused her to suspect that the driver might be impaired.  While these observations may have provided additional grounds to stop the vehicle based on the reasonable suspicion that the driver was impaired, the Court need not reach that conclusion.  Ranger Schonzeit had sufficient grounds to stop the vehicle in order to enforce the closure order and to also investigate whether the operator had violated the closure order such that she should be cited.

Once Ranger Schonzeit observed Ms. Stout's physical condition, including the odor of alcohol on her breath and the presence of an open container of alcohol in her hand, she had reasonable suspicion to investigate further to determine if Defendant was under the influence of alcohol.  *See Vondrak v. City of Las Cruces*, 2007 WL 3319449 (D.N.M. 2007) *8*, citing Rogala v. Dist. of Columbia*, 161 F.3d 44, 52 (D.C. Cir. 1998).  *See also United States v. Kranz*, 177 F.Supp.2d 760 (S.D. Ohio 2001) and *United States v. Caine*, 517 F.Supp.2d 586, 589-590 (D.Mass. 2007).   Thus, there is no basis for Defendant's argument at trial that Ranger Schonzeit did not have a lawful basis to stop or detain her vehicle or to investigate whether Ms. Stout was operating her vehicle while under the influence of alcohol.

**2.      Whether Defendant is Guilty of Counts One or Two of the Complaint Charging Her With Violating 36 C.F.R. § 4.23(a)(1) and (2).**

36 C.F.R. § 4.23(a) states as follows:

(a)  Operating or being in actual physical control of a motor vehicle is prohibited while:

(1)  Under the influence of alcohol, or a drug or drugs, or any combination thereof, to a degree that renders the operator incapable of safe operation; or

(2)  The alcohol concentration in the operator's blood or breath is 0.08 grams or more of alcohol per 100 milliliters of blood or 0.08 grams or more of alcohol per 210 liters of breath.  . . .

Section  4.23(c)(1) provides that an authorized person who has probable cause to believe that a motor vehicle operator is in violation of paragraph (a) may require the operator to submit

7

to one or more tests of the blood, breath, saliva or urine for purposes of determining blood alcohol and drug content.  Paragraph (c)(4) provides that any test shall be conducted by using accepted scientific methods and equipment of proven accuracy and reliability operated by personnel certified in its use.

Some federal courts have held that while a person can be charged with violating both 36 C.F.R. §4.23(a)(1) and (2), he or she cannot be convicted or separately punished under both sections because the charges arise out of one course of driving behavior.  *See United States v. Graham*, 2006 WL 1720675 (E.D. Va. 2006) *2.  An acquittal under one section, however, does not preclude conviction under the other section.  *Id.  See also United States v. Rauhof*, 2006 WL 3455066 (W.Va. 2006) *2, stating that a defendant "can be convicted, if at all, of either operating a motor vehicle with a BAC greater than .08 or operating a motor vehicle while under the influence of alcohol, but not of both."  *But see Volk v. United States*, 57 F.Supp.2d 888 (N.D.Cal. 1999) (affirming a judgment of conviction under both 36 C.F.R. § 4.23(a)(1) and (2)).  Before deciding whether it is necessary to resolve this issue, the Court must first determine whether Defendant is guilty under either Count One or Count Two of the Complaint.

A.   **Whether the Government Was Required to Present Testimony Converting the Breath-Alcohol Test Results to Blood-Alcohol Content.**

Defendant argues that the Government was required to present expert testimony converting the breath alcohol results from the Intoxilyzer 5000 to blood alcohol content or level in order to convict her under 36 § 4.23(a)(2).  Defendant's argument is legally incorrect.

Section 4.23(a)(2) prohibits a person from operating or being in physical control of a motor vehicle if the alcohol concentration in her breath is 0.08 grams or more of alcohol per 210 liters of breath.  The regulation also prohibits a person from operating or being in physical control of a motor vehicle if the alcohol concentration in her blood is 0.08 grams or more of alcohol per 100 milliliters of blood.  The regulation does not require the Government to present evidence converting the breath alcohol test results to blood alcohol content.  Instead, the regulation provides a legally acceptable method for measuring the level of alcohol in a person's

1   blood through a properly conducted breath test.  This conclusion is supported by substantial

2   federal case law holding that the admissibility and general reliability of Intoxilyzer test results is

3   well established.  *Volk v. United States*, 57 F.Supp.2d 888, 897-98 (N.D. Cal. 1999), citing

4   *United States v. Brannon*,146 F.3d 1194, at 1195-96 (9th Cir. 1998); *United States v. Reid*, 929

5   F.2d 990, 994 (4th Cir. 1991); and *United States v. Smith*, 776 F.2d 892, 898 (10th Cir. 1985).  *See*

6   *also United States v. Jackson*, 470 F.Supp.2d 654, 657-58 (S.D. Miss. 2007).  Breath tests results

7   are  admissible because they are recognized by statute or regulation as a reliable measure of the

8   alcohol content in the person's blood.

9          This construction is also supported by two unpublished Ninth Circuit dispositions.

10   *United States v. Medina-Cernas*, 237 Fed.Appx. 278 **1 (Ca.9, 2007 (Nev.)) and *United States*

11   *v. Ashurst*, 121 F.3d 717 (Table) (Ca.9, 1997 (Nev.)) (unpublished disposition).  In constructing

12   36 C.F.R. §4.23(a)(2), *Medina-Cernas* stated:

13              Although the regulation is poorly drafted, when these sections are
              read together, it is clear that blood alcohol can be measured either
14              directly through a blood sample (in which case the allowable level
              is 0.08 grams per 100 milliliters of blood), through a breath test (in
15              which the allowable level is 0.08 grams per 210 liters of breath) or
              the equivalent (but unspecified) amount in saliva or urine.  By
16              providing multiple tests which can be used to measure intoxication,
              the regulation inherently contains a "conversion" to blood alcohol
17              and no further "conversion" is needed.

18          *United States v. Ashurst* also states that the breath-alcohol test is not inadmissible because

19   it was not calibrated to read blood-alcohol levels.  "So long as the breath alcohol device was

20   properly calibrated to read breath-alcohol levels, and there is no indication it was not, a

21   corresponding blood-alcohol level could be determined."   While neither of these dispositions is

22   binding authority or precedent, they are consistent with this Court's construction of the

23   regulation.  A conviction under 36 C.F.R. § 4.23(a)(2) may be based on the results of an

24   Intoxilyzer 5000 test showing that the alcohol concentration in defendant's breath was 0.08

25   grams or more of alcohol per 210 liters of breath.  There is no requirement for additional proof

26   converting the breath test results into blood-alcohol content.

27   . . .

28   . . .

9

1

**B.** **Whether the Alcohol Concentration in Defendant's Breath Was 0.08**
**Grams or More of Alcohol per 210 Liters of Breath at the Time She**
2 **Was Operating or in Actual Physical Control of the Motor Vehicle.**

3    Defendant also argues that she cannot be found guilty under Count Two of the Complaint

4 because there was no evidence or testimony showing what her blood alcohol level was at the time

5 she operated or was in actual physical control of her motor vehicle.  Unlike some state DUI laws,

6 36 C.F.R. § 4.23(a)(2) does not make it unlawful to have a blood alcohol level above the legal

7 limit within a specified time after operating a motor vehicle.  Nor does it contain a presumption

8 regarding the person's blood alcohol level at the time he was operating or in physical control of a

9 vehicle based on subsequently obtained breath or blood test results.  Because there is no

10 presumption based on the test results, the Government is required to prove that a defendant's

11 blood alcohol content was above the legal limit at the time of operating the vehicle and not

12 merely at the time the breath or blood sample was taken.  *United States v. Wight*, 884 F.Supp.

13 400, 402 (D. Colo. 1995); *United States v. Rauhof*, 2006 WL (W.D.Va. 2006).

14    In *United States v. Wight*, the defendant was involved in a motor vehicle accident at

15 around 6:15 a.m.  The ranger arrived at the scene at approximately 7:00 a.m. at which time

16 defendant was still seated in the vehicle.  The ranger observed signs that defendant was under the

17 influence of alcohol and therefore administered field sobriety tests which the defendant failed.

18 The ranger arrested the defendant and transported him to the police department where an

19 intoxilyzer breath test was conducted at 8:27 a.m. which returned a result of 0.151 grams of

20 alcohol per 210 liters of air.  Defendant was thereafter charged with violating 36 C.F.R. §

21 4.23(a)(2) which at that time made it unlawful to have a blood alcohol content of 0.10 or more.

22 The court held that the intoxilyzer test results were admissible because there was no indication

23 that the intoxilyzer was not operating correctly or that the test was not administered properly.

24 The court held that the delay in obtaining the test affected the weight to be given to the evidence,

25 but not its admissibility.  The court, however, found the defendant not guilty of violating §

26 4.23(a)(2) because the Government failed to prove beyond a reasonable doubt that his blood-

27 alcohol level was above the legal limit at the time he was operating the motor vehicle or in actual

28 physical control of it.

10

In so holding, *Wight* relied on state court decisions, including *Desmond v. Superior Court of Maricopa County*, 161 Ariz. 522, 779 P.2d 1261 (1989), which require the state to present qualified expert testimony relating the breath or blood test results back to time that defendant was operating or in physical control of the vehicle.  In this regard, the court quoted *Desmond* as follows:

> "Many variables may affect the results of a blood alcohol test including the type of machine used in the test, the weight, sex, and physical condition of the driver, any medication the driver might be taking, how much food is in the driver's stomach at the time of the test (the more food in the driver's stomach, the less alcohol will be absorbed into the blood stream) and how long after driving the test was administered. See Dubowski, Absorption, Distribution and Elimination of Alcohol: Highway Safety Aspects, J. Stud. on Alcohol, Supp. No. 10 at 98, 99 (July 1985).  Of critical importance is whether the BAC was rising or falling at the time of the test which is usually administered about an hour after the driver is stopped and arrested. If the BAC is falling at the time the test was administered, the reading will be less than what the BAC was at the time the driver was stopped. (cit. omitted).  If the BAC is rising, the reading will be greater than the BAC at the time the driver was stopped. (cit. omitted).  In some instances, the BAC will rise after the driver is stopped, peak and then recede, producing a BAC that is the same as the BAC at the time the driver was stopped. Accordingly, there can be no presumption that a driver's BAC taken at the time he is stopped is as high as his BAC taken an hour later."

*Wight*, 884 F.Supp. at 403, quoting *Desmond*, 779 P.2d at 1266.

In holding that the Government failed to meet its burden, *Wight* further stated:

> Plaintiff chose to proceed on the "per se" violation. By doing so, it had an obligation under the regulation to establish the alcohol concentration at the time of driving or actual physical control. The test result at 8:27 a.m. was insufficient, in and of itself, to establish what Defendant's concentration was at 6:15 a.m., or even at 7:00 a.m. Once Plaintiff chose to proceed on the "per se" violation, it had to present qualified evidence that "related back" the test results to the time of driving or actual physical control. No such qualified testimony was offered in this case.

*Wight*, 884 F.Supp. at 403.

Similarly, in *United States v. Rauhof*, 2006 WL (W.D.Va. 2006), the court found a defendant not guilty of violating 36 C.F.R. § 4.23(a)(2) based on the test of a blood sample taken 4 hours after the defendant was involved in an accident and which showed a blood alcohol content of 0.12.  The court noted that *United States v. Sauls*, 981 F.Supp. 909, 925-26 (D. Md.

11

1    1997) held that the admissibility of breath test results are ordinarily dependent on the test having

2    been conducted within a reasonable time after the defendant was driving.  *Sauls* held that a

3    reasonable time is generally three hours.  The prosecution in *Sauls*, however, was based on

4    Maryland's incorporated DUI law which contained such a time provision and not on § 4.23(a)(2)

5    which does not.  In any event, *Rauhof* relied on *Wight* in acquitting the defendant because the

6    government failed to present any testimony as to what his blood alcohol content was at the time

7    of the accident.

8         The Government cites *Volk v. United States*, 57 F.Supp.2d 888 (N.D.Cal. 1999), in

9    support of its argument that the evidence supports a conviction of Ms. Stout under both 36

10   C.F.R. § 4.23(a)(1) and (2).  The Intoxilyzer test results in *Volk* indicated that defendant's blood

11   alcohol content was .193 and .190.  Although it is not clear from the decision when these tests

12   were performed in relation to when the officer stopped defendant's vehicle, the Government's

13   criminalist testified that "based on the test results and taking into account standard alcohol burn-

14   off rates, the alcohol level of the defendant at the time he was stopped ... was .21."  *Volk*, 57

15   F.Supp.2d at 897 n. 7.  In affirming the conviction, the court did not specifically address whether

16   the criminalist's testimony met the requirement for "relation back" testimony under cases such as

17   *Wight*.  The court, instead, cited all of the evidence presented during trial, including the officer's

18   observations of the defendant during the stop, the results of the field sobriety tests and the

19   Intoxilyzer 5000 test results, as sufficient to support the conviction under both § 4.23(a)(1) and

20   (2).

21        The facts in this case are arguably distinguishable from *Wight* and *Rauhof*.  The time

22   between Ms. Stout's operation of her vehicle and the breath tests was much shorter.  The

23   Intoxilyzer 5000 tests was performed approximately 35 to 39 minutes after the ranger observed

24   Ms. Stout operating her vehicle.  (Ranger Schonzeit testified that she first observed Defendant's

25   vehicle at 8:05 and then stopped behind it at approximately 8:06 p.m.  The intoxilyzer tests were

26   run at 8:41 and 8:44 p.m.)  As in *Volk*, the intoxilyzer test results of .178 and .182 were more

27   than double the 0.08 limit which, combined with the relatively short lapse of time, suggests that

28   Defendant's blood alcohol content was also above 0.08 at the time of the stop.  Dana Russell, the

12

1  trained forensic analyst called by the Government, testified that most people reach their

2  maximum alcohol concentration within 15 to 20 minutes after their last drink.  Ms. Russell also

3  testified that most people dissipate or lose alcohol at the rate of 0.02 grams per hour.  This would

4  therefore also suggest that a person with a blood alcohol content of .178 and .182 was above 0.08

5  35 to 40 minutes earlier.  Unlike the criminalist in *Volk*, however, Ms. Russell could not or

6  would not extrapolate on the basis of the Intoxilyzer results as to what Ms. Stout's blood alcohol

7  level was at the time her vehicle was stopped.

8        There was also an absence of testimony regarding the other factors referenced in *Wight*

9  and *Desmond*, such as the effect that Ms. Stout's sex, weight, or consumption of food may have

10  had on the absorption of alcohol into her system.  The evidence as to whether Ms. Stout's blood

11  alcohol content was rising or falling at the time the Intoxilyzer tests were administered is

12  inconclusive.  Although the PBT test indicated that Ms. Stout's blood alcohol content was .184,

13  that test is generally only admissible for purposes of establishing probable cause to arrest.  While

14  the first Intoxilyzer test at 8:41 p.m was .178, the second test at 8:44 was .182.  There was no

15  testimony as to whether this increase from the first to second intoxilyer test was significant.

16  Thus, it cannot be reliably determined whether Ms. Stout's blood alcohol content was rising or

17  dissipating when the breath tests were conducted.  Although the Court strongly suspects that Ms.

18  Stout's blood alcohol content was above 0.08 at the time she was operating or in physical control

19  of her vehicle, the Government has not met its burden under § 4.23(a)(2) to specifically prove

20  that Ms. Stout's blood alcohol was 0.08 or above at that earlier point in time.  Accordingly, the

21  Court finds Ms. Stout not guilty under Count Two of the Complaint.

22        The Count now turns to whether Ms. Stout is guilty under Count One of the Complaint

23  for operating a motor vehicle under the influence of alcohol to a degree that rendered her

24  incapable of safe operation in violation of  36 C.F.R. § 4.23(a)(1).  In regard to this charge, the

25  Court may consider all of the evidence presented at trial and is not limited to making a

26  determination based solely on test results regarding Defendant's blood alcohol content.  In

27  *United States v. Stanton*, 501 F.3d 1093, 1100 (9th Cir. 2007), for example, the court affirmed

28  defendant's conviction under § 4.23(a)(1) based on the totality of the circumstantial evidence

13

1    presented at trial and notwithstanding the magistrate judge's refusal to admit the breath test

2    results based the Government's failure to lay a proper foundation.  Likewise in *Volk v. United*

3    *States* and *United States v. Nguyen*, 2008 WL 540230 (E.D. Cal 2008), the district courts

4    affirmed the defendant's conviction under § 4.23(a)(1) based on all of the circumstantial

5    evidence relating to alcohol consumption and impairment.  *Nguyen* affirmed defendant's

6    conviction, notwithstanding that the magistrate judge had acquitted defendant under § 4.23(a)(2)

7    because of the inclusiveness of the Intoxilyzer test results.  The court in *United States v. Rauhof*,

8    2006 WL (W.D.Va. 2006) *3 also notes that a conviction under 4.23(a)(1) does not have to be

9    based on laboratory tests, although the court found in that case that there was insufficient

10   evidence to support a conviction under § 4.23(a)(1).

11          There are numerous facts which, viewed as a whole, support a finding that Ms. Stout was

12   under the influence of alcohol to a degree that rendered her incapable of safely operating her

13   vehicle as charged in Count One of the Complaint.  First, Ranger Schonzeit initially observed the

14   vehicle being operated in a somewhat erratic manner that raised a suspicion of driver impairment.

15   This included driving a significant distance with the right turn signal on without making a turn,

16   abruptly stopping and accelerating, and switching from high beams to low beams on several

17   occasions.  While these actions, standing alone, do not prove impairment, when viewed in light

18   of the subsequently developed facts, they support that conclusion.  Upon making contact with

19   Ms. Stout, Ranger Schonzeit observed a strong smell of alcoholic beverage on her breath.  Ms.

20   Stout's eyes appeared to be watery, red and bloodshot and she slurred her words and had

21   difficulty with pronunciation.  Ms. Stout was also holding an open, quarter full bottle of beer and

22   she told the ranger that she "had a few."  Upon exiting the vehicle, Ms. Stout was still holding

23   her beer and she swayed and leaned on the vehicle for support.  The ranger also observed other

24   empty beer bottles in the vehicle.  This evidence also supports the conclusion that Ms. Stout was

25   both under the influence of alcohol and that her ability to safely operate her vehicle was

26   impaired.  Ms. Stout failed all three of the field sobriety tests administered to her by Ranger

27   Schonzeit which further indicated that she was under the influence of alcohol to a degree that

28   rendered her incapable of safe operation.

1    Finally, the Intoxilyzer test results obtained within 40 minutes after the stop revealed that

2    Ms. Stout's blood alcohol content was more than twice the legal limit.  While these test results,

3    standing alone, cannot support Defendant's conviction under § 4.23(a)(2), they are additional

4    evidence, which combined with the other circumstances, clearly establish beyond a reasonable

5    doubt that Ms. Stout was under the influence of alcohol to a degree that rendered her incapable of

6    safely operating her vehicle in violation of 36 C.F.R. § 4.23(a)(1).

7                              **CONCLUSION AND VERDICT**

8    Based on the evidence presented at trial and the applicable law:

9    1.    The Court finds Defendant Rebecca Stout **guilty** on Count One of the Complaint

10   charging her with operating a motor vehicle while under the influence of alcohol to a degree that

11   rendered her incapable of safely operating her motor vehicle in violation of 36 C.F.R. §

12   4.23(a)(1).

13   2.    The Court finds Defendant Rebecca Stout is **not guilty** on Counts Two and Four

14   of the Complaint.

15   **IT IS HEREBY ORDERED** that this matter is hereby set for hearing on **January 13,**

16   **2010 at 9:00 a.m. in Courtroom 3A** for sentencing on Counts One and Three of the Complaint

17   or for further proceedings in accordance with the decision and verdict rendered herein.

18   DATED this 28th day of December, 2009.

19

20                                    _George Foley Jr._
                                       _____
21                                    GEORGE FOLEY, JR.
                                       United States Magistrate Judge
22

23

24

25

26

27

28

                                          15